F I L E D
U.S. DISTRICT COURT
MIDDLE DISTRICT OF TENN.

AUG - 7 2014

BY_____
DEPUTY CLERK

Susanne Gann
Darren Remington
533 Church St. #136
Nashville, TN 37219

# UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF MIDDLE TENNESSEE

| | |
|---|---|
| SUSANNE GANN and DARREN REMINGTON, domestic partners,<br><br>Plaintiffs,<br><br>v.<br><br>BRIAN G. KOLFAGE, SR.; BRIAN G. KOLFAGE, JR. also known as SENIOR AIRMAN BRIAN KOLFAGE; ASHLEY KOLFAGE; LOGAN ELIA,<br><br>Defendants. | No.<br><br><br>**COMPLAINT** |

Plaintiffs Susanne Gann and Darren Remington (collectively, "Plaintiffs"), representing themselves *pro se*, and for their Complaint against defendants Brian G. Kolfage, Sr., Brian G. Kolfage, Jr., Ashley Kolfage, Logan Elia (collectively, "Defendants") allege as follows:

### PARTIES AND JURISDICTION

1.  Plaintiff Susanne Gann ("Gann") is a resident of Tennessee and is domiciled with plaintiff Darren Remington.

2.  Plaintiff Darren Remington ("Remington") is a resident of Tennessee and is domiciled with Gann.

3.  Defendant Brian G. Kolfage, Sr. ("Kolfage Sr.") is a resident of Michigan and is the father of defendant Brian G. Kolfage, Jr.

4.  Defendant Brian G. Kolfage, Jr. ("Kolfage Jr.") is a resident of Arizona and is the son of Kolfage Sr., and is married to defendant Ashley Kolfage.

5. Defendant Kolfage Jr. is also known by the names Senior Airman Brian Kolfage and Airman Kolfage.

6. Defendant Ashley Kolfage ("A. Kolfage") is a resident of Arizona and is married to Kolfage Jr.

7. Defendant Logan Elia ("Elia") is a resident of Arizona and is an attorney of record for Kolfage Jr. and A. Kolfage.

**GENERAL ALLEGATIONS REGARDING GANN AND REMINGTON**

8. Gann is a graduate of the University of Mississippi, at Oxford, Mississippi, with a Bachelor of Arts degree. She graduated with a major in Accounting from the Patterson School of Accountancy, one of the top ten schools of Accounting in the nation, and a minor is Real Estate.

9. Gann graduated with an above-average 3.10 cumulative Grade Point Average (GPA). She was also named to the Dean's List multiple times, while attending the University.

10. Gann is recently attempting to re-enter the full-time workforce, having given birth in July, 2012, and enduring a number of post-partum medical issues, including a debilitating incisional hernia which was a months-long complication of her delivery by caesarean section.

11. Gann's ability to successfully pursue a career in the Accounting profession is dependent upon her reputation for honesty and good moral character. She markets not only her talent and experience, but her personal ethic and principles as well.

12. Gann conducts herself with honor, dignity, and integrity.

13. Gann works hard to maintain this reputation, specifically including her reputation online.

14. Remington is a Military Veteran with just over 10 years of military service. He originally enlisted in the U.S. Army on his 17th birthday in 1983, the earliest date

1    possible for him to enlist. Remington transferred to the U.S. Air Force (USAF) effective
2    August 23, 1985.

3   15.   He was promoted to the rank of Staff Sergeant in the USAF in May, 1990. This rank is
4        superior to the highest rank attained by Kolfage Jr. and is awarded based on meritorious
5        service and not simply "Time-In-Grade/Time-In-Service" as was the highest rank
6        attained by Kolfage Jr.

7   16.   During his service with the USAF, Remington was trained and qualified in two
8        occupational specialties, also known as Air Force Specialty Codes (AFSC). For both of
9        those specialties, he was selected as "Honor Graduate" at the Technical Training
10       Schools. Being selected as "Honor Graduate" for one AFSC is rare. Being selected
11       twice for two different specialties is almost unheard of.

12  17.   Remington held the highest security clearance (Top Secret) with special designator
13       SIOP/ESI. This clearance was required for the performance of his duties with the Joint
14       Strategic Target Planning Staff (JSTPS) and gave him access to the United States' most
15       closely guarded nuclear secrets.

16  18.   Remington separated from active duty with an honorable discharge on April 1, 1993.

17  19.   Since departing active duty, Remington has pursued a vocational career as an
18       information technology (IT) professional, continuing to use his experience and
19       expertise with computer systems gained as a Communications/Computer Systems
20       Programming Specialist for the USAF. He has worked in all areas of software
21       development including, but not limited to, Computer Security and Information Security.

22  20.   Remington has had a lifelong interest in political history in the United States. As a
23       registered Republican, he describes himself as an "Eisenhower Conservative".
24       Remington is a lifelong Christian with a longtime interest in the history of the Bible.

25  21.   Remington's ability to successfully continue to pursue a career in his chosen
26       profession is dependent upon his reputation for honesty and good moral character.

1     He markets not only his talent and experience, but his personal ethic and principles
2     as well.

3 22.   Remington conducts himself with honor, dignity, and integrity.

4 23.   Remington works hard to maintain this reputation, specifically including his
5     reputation online.

6             **GENERAL ALLEGATIONS REGARDING DEFENDANTS**

7 24.   Plaintiffs incorporate the previous allegations as though set forth completely herein.

8 25.   Under information and belief, the list of administrators for Kolfage Jr.'s autonymous
9     Facebook page (see https://www.facebook.com/BrianKolfage ) includes Kolfage Sr.,
10    who also has his own autonymous Facebook page.

11 26.   "Stolen Valor" is an illegal act regarding the lying about, exaggerating or otherwise
12    misrepresenting military service, awards, decorations and/or rank. It is an all-too-
13    common occurrence among non-veterans and military veterans alike which many
14    veterans like Remington take as a personal insult to their own military service. The
15    Supreme Court has determined that claiming "stolen valor" is protected as free speech
16    unless used to receive tangible benefit such as (but not limited to) free meals, free
17    tickets, or actual money.

18 27.   There is a group of military veterans who have banded together to detect, investigate
19    and expose perpetrators of "stolen valor". This group operates the Facebook community
20    page, "Stolen Valor" (see https://www.facebook.com/StolenValor ). There is an
21    associated webpage called "This Ain't Hell" (see http://thisainthell.us/blog/ ) which
22    assists in investigating and facilitates discussion among veterans and interested
23    members of the public regarding possible cases of "stolen valor". A cursory review of
24    either site demonstrates that "stolen valor" is just as likely to be committed by actual
25    military veterans (including "disabled veterans") as by non-veterans.

26 28.   It is through an entry on the "This Ain't Hell" website that Remington first became

aware of Kolfage Jr. This entry highlights postings made to Kolfage Jr's autonymous Facebook page, which Kolfage Sr. also manages, which encourages active duty servicemembers to disobey orders and commit mutiny. This entry also contains discussion by several veterans of what they view as unacceptable conduct by Kolfage Jr. (see http://thisainthell.us/blog/?p=37377 ).

29. Under information and belief, contrary to public characterizations by the defendants, Kolfage Jr's military service was unremarkable and undistinguished. He was never promoted based on merit but only on the basis of "Time-in-Grade/Time-in-Service" as is normal for low-ranking enlisted personnel.

30. Under information and belief, by Kolfage Jr.'s own admission, he was only wounded in the first place because he harassed and intimidated a fellow airman in order to take his place at Balad Air Base.

31. Under information and belief, there is no evidence publicly available to support Kolfage Jr.'s claim that he is "the most seriously injured airman in United States history who survived." This is a claim that Kolfage Sr. has repeatedly promoted as some sort of fact that has been verified by the U.S. military. There is no credible methodology or mechanism existing to verify such absurd, unquantifiable and subjective claim. In fact, while Kolfage Jr. is in fact a "triple amputee", Mr. Clarence "Red" Mosley was an airman who served in the US Air Force during the Korean War and was so severely wounded that he lost both hands and legs, becoming a quadruple amputee. Mr. Mosley was obviously more severely wounded than Kolfage Jr. and he survived his wounds to live a full life until his death in 2011.

32. Under information and belief, Kolfage Jr. has impersonated superior rank on at least one occasion.

33. Under information and belief, contrary to the rules of military law, known as the Uniform Code of Military Justice (UCMJ), Kolfage Sr. and Kolfage Jr. also refuse to

1      place an indicator of Kolfage Jr's retired status with his rank on his autonymous
2      Facebook page.

3 34.    Under information and belief, contrary to the UCMJ, Kolfage Sr. and Kolfage Jr. also
4      refuse to remove Kolfage Jr's picture, portraying him in full service dress uniform,
5      from his autonymous Facebook page which is rife with extreme and incendiary political
6      statements.

7 35.    Under information and belief, as part of his political activities, Kolfage Jr. has on more
8      than one occasion publicly encouraged active duty servicemembers to commit mutiny
9      and disobey lawful orders. This, by the very definition of the word, is sedition. It has
10     also been noticed by members of the public at large that Kolfage Jr. has portrayed the
11     nature of his military service in a seemingly deceptive light.

12 36.    Under information and belief, Kolfage Jr. has lied about the nature of his military
13     service, making claims that he was trained as a pilot but served as an "Army
14     policeman".

15 37.    According to Kolfage Jr. and A. Kolfage's own public statements, Kolfage Jr. initiated a
16     sexual relationship with A. Kolfage on their first date in early 2008. Kolfage Jr.'s first
17     wife, Paige Kolfage, formerly a resident of AZ, petitioned for divorce in December,
18     2009. From these facts, Kolfage Jr. was engaged in an extramarital affair for almost 36
19     months prior to being divorced from his first wife, Paige, in 2011.

20 38.    As a recipient of a military pension, the medically retired Kolfage Jr. is still subject to
21     the jurisdiction of the UCMJ. Adultery is a violation of the UCMJ.

22 39.    Under information and belief, even as recently as July 14, 2014, Kolfage Jr. has passed
23     the creative work of another person as his own creation in a blatant act of plagiarism.

24 40.    Under information and belief, Kolfage Jr. operates under a definition of integrity
25     differing from the generally accepted convention. By his own admission, the
26     Department of Veteran's Affairs (VA) has determined that Kolfage Jr. illegitimately

received over $4800 in benefits to which he was not entitled. He has further alleged that the VA admitted to him that this was due to a clerical error. Kolfage Jr. has not made any such admission by the VA publicly available and the VA is forbidden by law or regulation from commenting outside a court of law on such matters. Subsequent to the earlier admissions by Kolfage Jr., he has most recently claimed that the VA has increased that determination of unentitled benefits to $7000. This is hardly the result one would expect from correcting a "clerical error".

41. Under information and belief, defendants operate an alleged charity as an apparently unregistered business enterprise consisting solely of Kolfage Jr. and A. Kolfage. The enterprise has not applied for 501(c)(3) status and as there appears to be no organization behind it, the enterprise does not appear to qualify for such status. Defendants have refused to make a public accounting of expenditures and donations of the enterprise, contrary to normal practice for legitimate charities while also disqualifying it for 501(c)(3) status.

42. Under information and belief, the name of defendants' alleged charity is "Wounded Warrior Mentoring Engagements". This name is very similar, as to be almost identical, to a legitimate registered charity named "Wounded Warrior Mentoring Project". To the untrained eye, there is a great potential for "brand confusion". Such brand confusion could possibly lead to fewer donations to the legitimate, more established, older "Wounded Warrior Mentoring Project".

43. Under information and belief, Kolfage Jr. has alleged that he started the business enterprise as a solo venture, instead of joining with other more established charities, due to decreased funding from the VA for such ventures. This allegation by the defendant is uncorroborated by other entities of similarly stated purpose as the defendant's business venture, such as the Wounded Warrior Mentoring Project.

44. Under information and belief, the activities conducted by the Kolfage Jr. as part of his

1    business venture appear to be primarily public speaking, "whirlwind tours" of overseas

2    locations and other such public appearances. Mentoring traditionally involves long-term

3    one-on-one relationships. With defendant's schedule of classes, homework, and public

4    appearances there does not appear to be any mentoring having occurred. As

5    "Mentoring" is included in the name of the enterprise, this could be construed as a

6    deceptive trade practice.

7  45.    Under information and belief, in addition to the autonymous Facebook page listed

8    above, Kolfage Jr. is also administrator of the currently defunct "Team Kolfage Against

9    Bullying" Facebook page (TKAB). Through the TKAB attack page, numerous

10    harassing and/or defaming posts aimed at Remington were made, in an attempt to get

11    him fired from his job (see https://www.facebook.com/pages/Team-Kolfage-Against-

12    Bullying/ ).

13  46.    Under information and belief, Kolfage Jr.'s attitude toward people of different religious

14    beliefs, other than his own, is one of contempt and derision.

15  47.    Under information and belief, Kolfage Jr. has used his Twitter account to harass,

16    intimidate and/or defame individuals he disagrees with. This includes the whole-cloth

17    fabrication of fake posts which he attributes to such individuals.

18  48.    Under information and belief, Kolfage Jr.'s autonymously named Facebook page and

19    Twitter account have both been suspended at least once for violations of providers'

20    standards of proper conduct.

21  49.    Under information and belief, Kolfage Jr. was involved in the operation of at least one

22    fake Facebook profile impersonating Louis Anthony Caponecchia ("Caponecchia").

23    Such profile was used to attack Gann, threatening to kill Gann's infant daughter, Alana,

24    posting "Such a cute baby. I wonder how she'd look in a tiny casket" in reference to a

25    picture of Alana posted on Gann's and Remington's pseudonymous Facebook profiles.

26  50.    As part of the campaign to harass, intimidate and place Gann in a false light, while

1    aiding and assisting Kolfage Jr. in rehabilitating his online image, Elia has composed

2    and filed a nuisance Civil Complaint CV2014-003746 ("AZ Complaint") with the

3    Maricopa County District of the Arizona Superior Court naming Remington as one of

4    seven defendants. As of the date of filing this complaint, service against Remington has

5    not been perfected for the AZ Complaint and therefore the AZ Complaint does not yet

6    comprise an actual action as far as concerns this Court.

7  51.    On Feb 12, 2014, Gann and Remington became aware of a fake Facebook page which

8    was set up to harass them both and a corresponding false profile page impersonating

9    Remington. The contents of these two pages were clearly intended to harass Gann and

10    Remington - publishing private photos and personal information along with

11    inflammatory and false accusations. Among the items harassing Gann was a screen

12    capture of part of a background check on her, making a false accusation of criminal

13    wrongdoing on Gann's part. Gann's full legal name was made public, though it had not

14    previously been publicly available through her pseudonymous Facebook page.

15    Plaintiffs' home address was also posted along with a map to their home. Pictures of

16    Gann's infant daughter, Alana Remington, were included in a collage with Gann's

17    image in an erotic pose with images of goats superimposed to imply bestiality and child

18    abuse.

19  52.    Gann noticed that one of the pictures posted was a screenshot made by someone using

20    her Facebook account. This confirmed a threatening message ("PM") sent to

21    Remington on Jan 24, 2014, from a "fake" Facebook profile which had impersonated

22    Caponecchia's mother, Margret Caponecchia, and has been alleged to be used by

23    Kolfage Sr. This fake Facebook profile also used Gann's surname in a blatant act of

24    harassment.

25  53.    A screen capture of an excerpt of that "Private Message" ("PM") conversation (referred

26    to in paragraph 52) was posted to the Kolfage Jr.'s autonymous Facebook page,

1    indicating that Kolfage Sr. and Kolfage Jr. had direct access to the account which

2    admitted hacking Gann's Facebook profile and supporting the conclusion that the

3    Kolfage family was using that account to harass and attack Remington and other

4    Facebook users, including Caponecchia.

5  54.   Under information and belief, both Kolfage Sr. and Kolfage Jr. have confirmed

6    themselves to be administrators of Kolfage Jr.'s autonymous Facebook page.

7  55.   The private and personal information which was acquired illegally through Gann's

8    "hacked" Facebook account, was misused by Kolfage Jr. on his autonymous Twitter

9    page, along with posting false accusations of "leaking" sensitive information, blatantly

10    harassing Remington in a malicious attempt to get Remington fired from his job at

11    FedEx, and violating Remington's copyright to said image. Defendants have offered no

12    plausible explanation outside of illegally accessing Gann's "hacked" account on how

13    they made the connection of Remington's pseudonymous Facebook page to

14    Remington's legal name.

15  56.   Under information and belief, Kolfage Sr. also harassed and defamed Remington, in

16    further attempts to get Remington fired, through various incendiary posts to the

17    currently defunct TKAB attack page. Kolfage Jr. has admitted to controlling the TKAB

18    attack page.

19  57.   On March 6, 2014, Remington was informed that A. Kolfage was using/controlling the

20    fake "Darren Remington" profile. This same fake profile was used to contact

21    Remington's family in Florida, through Facebook on February 14, 2014. This was

22    clearly intended to harass Remington through other members of his family. In April,

23    Remington was informed by Jori Remington that her gmail account had been

24    compromised, or "hacked", by someone in AZ. Both Kolfage Jr. and A. Kolfage

25    currently are residents of AZ.

26  58.   Subsequent to the removal of the first fake profile and impersonation page, at least a

half-dozen fake profiles and harassing pages have been created and subsequently removed by Facebook, as they have been discovered, for violating Facebook's standards of proper conduct. These accounts have been used to post the same harassing material as published on the original fake profile and harassing page, and which had been misused by Kolfage Sr. and Kolfage Jr.

59. The most recent harassing page to be removed for violating Facebook standards of conduct was a page named "Big Juan". The page was removed in April, 2014. The "cover photo" for the page featured only eight individuals to include Gann plus the seven named defendants in the AZ Complaint (see paragraph 50). "Big Juan" was also the name of a Mexican restaurant chain with two locations in Tucson, AZ, where Kolfage Jr. and A. Kolfage reside. The chain was opened in March, 2012, and announced its closure in January, 2013. Shortly before being removed, the page was renamed "Big Juan Prager" and more pictures were posted of John Prager's family, as culled from Facebook, Myspace, and other Internet sources. This clear violation of Prager's copyright was another thinly veiled attempt of harassment, intimidation and coercion. Prager is one of the seven named defendants in the AZ Complaint.

60. Remington subsequently discovered an account on the career networking site, LinkedIn, using Remington's name and listing their location as Hawaii, where Kolfage Jr. is known to have resided with his mother. The account was created on or about the date that Remington was alerted to the first imposter Facebook profile in February.

61. Under information and belief, Gann and Remington are not the only victims of defendants' harassment. Other victims include (but are not limited to) Jan Vrotsos, Bryan Andrew Klaves, Kristi Shields, and Mike A Duncan.

62. Under information and belief, regarding Jan Vrotsos, Kolfage Sr. and Kolfage Jr. posted fabricated screen captures, claiming them to be legitimate screen captures of statements by Ms. Vrotsos. Kolfage Sr. and Kolfage Jr. claimed that the screen shots had been

1  confirmed to be legitimate by various law enforcement agencies. It was later revealed

2  that the screen shots had never even been examined by law enforcement agencies on

3  behalf of any of the defendants. As a result of the defendant's posting Ms. Vrotsos'

4  home address and phone number to Kolfage Jr.'s autonymous Facebook page, Ms.

5  Vrotsos and her elderly mother received hundreds of phone calls and email messages

6  threatening both of them (and their dog) with death.

7  63.  Under information and belief, regarding Bryan Andrew Klaves, defendants claimed that

8  Mr. Klaves had "attacked" Kolfage Jr. online, and proceeded to foment a vigilante

9  mindset to get Mr. Klaves fired from his job with the VA.

10  64.  Under information and belief, regarding Kristi Shields, Kolfage Sr. and Kolfage Jr.

11  presented fabricated screen captures, claiming them to be legitimate screen captures of

12  statements by Ms. Shields, and fomenting a vigilante mindset among his many

13  thousands of internet followers to create a situation similar to what happened with Ms.

14  Vrotsos and Mr. Klaves. Defendants urged Kolfage Jr.'s followers to "Make her

15  famous" which was obviously a thinly veiled threat of harassment and intimidation.

16  65.  Under information and belief, regarding Mike A Duncan, while making a public call to

17  victimize Mr. Duncan in similar manner as Ms. Vrotsos, Mr. Klaves and Ms. Shields,

18  Kolfage Sr. and Kolfage Jr. proudly claimed that they believe in "street justice".

19  Defendants posted Mr. Duncan's home phone and address to defendant's autonymous

20  Facebook page in a clear attempt to encourage his thousands of internet followers to

21  harass Mr. Duncan. It should be noted that Mr. Duncan is a 20-year veteran of the

22  USAF, retiring with the rank of Technical Sergeant, a rank superior to that of either

23  Remington or Kolfage Jr. and had no previous interaction with defendants. The critical

24  Facebook posts that defendants took offense to were made by Tami Duncan, Mr.

25  Duncan's spouse, using her own autonymous Facebook profile.

26  66.  Under information and belief, Kolfage Sr. and Kolfage Jr. have confirmed their

1   involvement in such domestic terrorism as described in paragraphs 62 to 65.
2   Defendants have stated, "... they said mean stuff, so I exposed them and all their info."
3   By these actions, defendants have demonstrated that they have no compunction about
4   recklessly disregarding the law to seek revenge for perceived wrongs, no matter how
5   slight. People who are not mentally disturbed would go to the police, or report such
6   offensive material to the site administrators where the content is found, actions that
7   defendants failed to take because the critical posts that the defendants have taken
8   offense to are neither criminal nor inappropriate.

9  67.  Under information and belief, defendants' online behavior, through autonymous
10       Facebook and Twitter pages, and other Facebook pages demonstrate a pattern of serial
11       harassment and intimidation.

12  68.  Remington's involvement with defendants began on or about January 10, 2014, when
13       he encountered a posted entry on the "This Ain't Hell" website (see
14       http://thisainthell.us/blog/?p=37377 ) outlining Kolfage Jr.'s calls for mutiny among
15       active duty servicemembers.

16  69.  Through that blog entry, Remington found Kolfage Jr.'s autonymous Facebook page
17       and commented on one of the more blatantly deceptive and untrue memes posted by the
18       defendant. Defendants proceeded to promptly ban Remington from the autonymous
19       Facebook page. That meme, along with all accompanying comments, has since been
20       removed from public view.

21  70.  The "Urban Dictionary" defines a meme as "a pervasive thought or thought pattern that
22       replicates itself via cultural means"
23       (source: http://www.urbandictionary.com/define.php?term=meme ). On Facebook, it is
24       common to express such ideas using a picture with a short textual quote or caption
25       overlayed or otherwise incorporated into the picture, similar to political cartoons
26       printed in newspapers. This is referred to by Facebook users as a "meme".

71. Referred by an entry on the "Stolen Valor" Facebook page, Remington then encountered one of Caponecchia's pages and viewed the harassment and bullying that Caponecchia had been subjected to by Kolfage Sr., A. Kolfage's father, Art Goetz, and an anonymous email account ("snomad700@yahoo.com") on behalf of, and of benefit to, defendants Kolfage Jr. and A. Kolfage.

72. On Jan 10, 2014, Remington sent an email to "snomad700" to deliver a message to Kolfage Sr., and Art Goetz, suggesting that they immediately cease the harassment and bullying of Caponecchia. The IP address of the response from "snomad700" indicates that it was sent from somewhere near Dearborn, MI, where Kolfage Sr., is known to reside. An "IP Address" is a unique identifier of a computer connected to a computer network, such as the Internet.

73. The harassment of Gann started on February 12, 2014, when the first fake pages impersonating Remington were published on Facebook. Gann has had no direct interaction with defendants and such harassment was clearly intended to silence and intimidate Remington by harassing and embarrassing his close friends and family members. The harassment of Gann includes the public posting of her home address, with a map showing the location; the public posting of personal telephone numbers; the public posting of other personal, sensitive information. The information was posted in such manner as to maliciously and wrongfully imply Gann was involved in criminal activities.

74. Under information and belief, the three principle people involved in the illegal "hacking" of Gann's Facebook account and subsequent harassment of Gann and Remington are: Kolfage Jr., A. Kolfage, and Kolfage Sr.

75. Under information and belief, Kolfage Sr. and Kolfage Jr. have frequently posted public statements of a political nature that clearly identify them as aligned with the extreme right wing of the political spectrum in the United States. Elia has also posted

information publicly that indicates he is aligned with and of the same extreme political beliefs as Kolfage Sr. and Kolfage Jr.

76. Elia has composed and filed the AZ Complaint as part of the campaign to harass and intimidate Gann through attacking and defaming Remington, while aiding and assisting Kolfage Jr. in rehabilitating his online image. He has clearly lied to the media about the nature of the lawsuit as he stated in an interview with the media on June 06, 2014, that his intent was to get the "harassment" and "lies" about Kolfage Jr. and A. Kolfage to stop. Elia did not send any "cease and desist" letters to the named defendants in the AZ Complaint, as would be customary if his intent truly were to simply stop what they have portrayed as harassment.

77. Under information and belief, Kolfage Jr.'s family and followers have been encouraging Kolfage Jr. to pursue a political career, even the Office of the President of the United States. The negative, yet accurate, information which Kolfage Jr. wishes to have removed from the internet by means of the AZ Complaint would preclude the furtherance of such political aspirations.

78. By and through the baseless AZ complaint, Elia is furthering the campaign of harassment and intimidation of Gann by attacking Remington. As a licensed attorney in the state of Arizona, Elia knows, or should know, that a "False Light" tort applies to private non-public individuals, such as Gann and Remington, and not public figures such as the defendants. The lifestyle and daily activities of the defendants, as described by the defendants in the AZ complaint and in published interviews, are clearly that of public figures.

79. There may be others involved that Gann and Remington are currently unaware of and who will be impleaded as additional defendants as further information is made available through the discovery process for this action.

80. The information and averments contained in paragraphs 42 to 65 have been included in

1    Criminal Complaint 14-0598213, filed by Gann and Remington with the local Police
2    Department here in Davidson County, naming Kolfage Jr., A. Kolfage and Kolfage Sr.
3    as principle suspects. The criminal complaint outlines how Gann's Facebook account
4    was "hacked" (a federal crime, as well as a crime in the states of TN and AZ) and that
5    illegal access led to the disclosure of Gann's full, legal name which was not accessible
6    or available from Gann's pseudonymous Facebook account. The illegal access also led
7    to the disclosure of Remington's full, legal name which was not otherwise accessible or
8    available to the public through Remington's pseudonymous Facebook account. The
9    defendants have yet to explain with any plausibility how they made the connection
10   between Gann's legal identity and her pseudonymous Facebook profile, or how they
11   made the connection between Remington's legal identity and his pseudonymous
12   Facebook profile. The fact that they made use of private, personal information that was
13   not otherwise available is unconscionable and offensive.

14   81.   That Elia has facilitated the persistent campaign of harassment, intimidation
15         and defamation by and through filing the AZ Complaint is unacceptable for
16         any officer of the court. It is especially troubling that Elia has utterly failed to
17         do his due diligence before presenting the AZ Complaint to the Court in
18         Arizona. That he intends to try that case in the media instead of in court is
19         evidenced by the dozens of Internet articles referencing that case (posted even
20         before all defendants have been served) such as found at
21         a.) http://www.roselawgroup.com/rlgers/rose-law-group-litigation-cyber-law-
22         attorney-logan-elia-tells-fox-10-suit-facebook-bullies-video.html ,
23         b.) http://www.roselawgroup.com/rlgers/disabled-vet-ua-student-sues-
24         facebook-posters-smear-campaign-represented-rose-law-group-cyber-law-
25         attorney-logan-elia.html ,
26         c.) http://tucson.com/news/local/veteran-s-social-media-suit-seeks-to-define-

libel/article_cff9648a-7e1d-5580-81b2-8b09cc1a6f95.html ,

d.) http://www.military.com/daily-news/2014/07/08/air-force-vet-in-social-media-lawsuit.html?comp=1199436026997&rank=1 ,

e.) The media coverage has reached as far east as Boston: http://www.myfoxboston.com/story/25971722/2014/07/08/valley-military-vet-files-lawsuit-against-online-bullies

82. Defendants are also attempting to try the AZ Complaint in the media from Kolfage Jr.'s newly re-launched political website http://www.woundedamericanwarrior.com/triple-amputee-war-veteran-brian-kolfage-law-suit-filed/ . Such activities by defendants will make any fair hearing for the named defendants in the AZ Complaint impossible as defendants named in this Complaint have severely poisoned any potential jury pool.

83. To be clear, the local media in Arizona was provided with an electronic copy of the AZ Complaint (sans any complaint number) before the first defendant named in the AZ complaint had been served, even before the AZ Complaint had been filed with the AZ Court.

84. As of the date of filing this complaint, service against Remington has not been perfected for the AZ Complaint and therefore the AZ Complaint does not yet comprise an actual action as far as concerns this Court.

## FIRST CAUSE OF ACTION
### (Civil Conspiracy)

85. Plaintiffs incorporate the previous allegations as though set forth entirely herein.

86. A "civil conspiracy" is defined as a "combination between two or more persons to accomplish by concert an unlawful purpose, or to accomplish a purpose not in itself unlawful by unlawful means, Participating in a civil conspiracy is not an independent tort. It is a derivative claim that requires the existence of an underlying tort or wrongful act committed by one or more of the conspirators in furtherance of the conspiracy."

1  *Birmingham-Jefferson County Transit Auth. v. Boatright*, 2009 U.S. Dist. LEXIS
2  74021, 13-14 (M.D. Tenn. Aug. 20, 2009).

3  87.  Each conspirator is jointly and severally liable for each act done by the other
4  conspirators. *Klistoff v. Superior Court*, 157 Cal. App. 4th 469 (Cal. App. 2d Dist.
5  2007).

6  88.  It is not necessary to prove individual conspirators were involved in all aspects of the
7  conspiracy or that they knew all of the details involved.

8  89.  Defendants' behavior and actions as set forth above demonstrate a concerted effort to
9  harass, defame and otherwise intimidate Gann and Remington into remaining silent
10  regarding the objectionable activities and public statements of Kolfage Jr. On its face,
11  this is a conspiracy *per se*.

12  **SECOND CAUSE OF ACTION**

13  **(False Light)**

14  90.  Plaintiffs incorporate the previous allegations as though set forth entirely herein.

15  91.  Defendants' behavior as set forth above has given publicity to matters concerning
16  Plaintiffs in such a way as to place Plaintiffs before the public in a false light.

17  92.  The false light, including but not limited to portraying Plaintiffs as criminals, liars,
18  cheats, and sexual deviants, is highly offensive to Plaintiffs and other reasonable
19  people.

20  93.  Defendants' statements constitute a major misrepresentation of Plaintiffs' character,
21  history, activities and beliefs.

22  94.  Defendants had knowledge of or acted in reckless disregard as to the falsity of the
23  publicized matter and the false light in which they placed Plaintiffs.

24  95.  The Plaintiffs were placed in the false light in furtherance of the objective of the
25  conspiracy as outlined in the First Cause of Action.

26  **THIRD CAUSE OF ACTION**

**(Defamation)**

96. Plaintiffs incorporate the previous allegations as though set forth entirely herein.

97. The Defendants have made statements regarding Gann and Remington as set forth above.

98. Defendants published these statements to third parties by posting them online.

99. Defendants' statements are false.

100. Defendants' statements are defamatory.

101. When Defendants posted their statements on the internet, they acted with actual malice and knew that the statements were false and defamatory.

102. In the alternative, when Defendants posted their comments on the internet, they acted with a reckless disregard for whether the statements were false and defamatory.

103. In the alternative, when Defendants posted their comments on the internet, they acted with a negligent disregard for whether the statements were false and defamatory.

104. Defendants posted their comments on the internet in a purposeful attempt to damage Plaintiffs' good name, reputation, and prospects for present and future employment.

105. Defendants' statements have harmed, and are continuing to harm, Plaintiffs' good name, reputation, and prospects for present and future employment.

106. Defendants' statements deter third persons from associating or dealing with Plaintiffs.

107. Defendants' statements have brought Plaintiffs into contempt or ridicule.

108. Defendants' statements have impeached Plaintiffs' honesty, integrity, virtue, and reputation.

109. Some of Defendants' statements allege criminal activity and are defamatory *per se*.

110. Plaintiffs will continue to be harmed by Defendants' comments until they are de-indexed from major internet search engines.

111. Plaintiffs were defamed by Defendants in furtherance of the objective of the conspiracy as outlined in the First Cause of Action.

## FOURTH CAUSE OF ACTION

### (Tortious Interference of a Business Relationship)

112. Plaintiffs incorporate the previous allegations as though set forth entirely herein.

113. Remington had a valid ongoing business relationship with FedEx.

114. Defendants knew about that business relationship.

115. Defendants intentionally attempted to induce FedEx to terminate that relationship with Remington.

116. Gann and Remington have suffered economic damage as a result of the termination of that relationship.

117. Defendants embarked in the tortious interference in furtherance of the objective of the conspiracy as outlined in the First Cause of Action.

## FIFTH CAUSE OF ACTION

### (Harassment)

118. Plaintiffs incorporate the previous allegations as though set forth entirely herein.

119. Defendants, with the malicious intent to frighten, intimidate or cause emotional distress, did communicate with third parties by telephone, in writing or by electronic communication, including, but not limited to, text messaging, facsimile transmissions, electronic mail or Internet services, without legitimate purpose.

120. As the result of the communications referred to in paragraph 118, Gann and Remington were frightened, intimidated and emotionally distressed.

121. The Defendants' actions and statements regarding Gann and Remington as set forth above are forms of harassment. *Tennessee Statutes,* § 39-17-308.

122. Defendants harassed Gann and Remington in furtherance of the objective of the conspiracy as outlined in the First Cause of Action.

## SIXTH CAUSE OF ACTION

### (Intentional Infliction of Emotional Distress)

1    123. Plaintiffs incorporate the previous allegations as though set forth entirely herein.

2    124. The conduct of the defendants is extreme and outrageous.

3    125. Defendants intended their actions to cause emotional distress.

4    126. In the alternative, Defendants recklessly disregarded the near certainty that Plaintiffs

5          would suffer emotional distress resulting from their conduct.

6    127. Plaintiffs have, in fact, suffered extreme emotional distress as a result of Defendants'

7          conduct.

8                          **SEVENTH CAUSE OF ACTION**

9                          **(Misuse of Private Information)**

10   128. Plaintiffs incorporate the previous allegations as though set forth entirely herein.

11   129. Plaintiffs had a "reasonable expectation of privacy" in relation to information

12          publicized by the Defendants via posting background reports, personal photos and other

13          such material on the Internet.

14   130. Defendants have no reasonable justification for the disclosure of the private information

15          (such as a public interest).

16   131. The Defendants' actions and statements regarding Gann and Remington as set forth

17          above constitute the misuse of private information.

18   132. Defendants misused Gann's and Remington's private information in furtherance of the

19          objective of the conspiracy as outlined in the First Cause of Action.

20                          **EIGHTH CAUSE OF ACTION**

21                              **(Impersonation)**

22   133. Plaintiffs incorporate the previous allegations as though set forth entirely herein.

23   134. The Defendants' actions and statements regarding Remington as set forth above include

24          the intentional and malicious impersonation of Remington with the intent to deceive

25          third parties. *Tennessee Statutes,* § 39-16-301.

26   135. Defendants impersonated Remington in furtherance of the objective of the conspiracy

as outlined in the First Cause of Action.

## NINTH CAUSE OF ACTION

### (Copyright)

136. Plaintiffs incorporate the previous allegations as though set forth entirely herein.

137. Unauthorized reproduction ("copying") of creative works, such as private correspondence (as contained in "Private Messages") or personal pictures is a violation of the *U.S. Copyright Act*, 17 U.S.C. §§ 101 - 810.

138. The unauthorized use of pictures and creative work owned by Gann and Remington on the part of the defendants as set forth above comprise infringement of plaintiffs' copyrights.

139. Defendants infringed Gann's and Remington's copyrights in furtherance of the objective of the conspiracy as outlined in the First Cause of Action.

## TENTH CAUSE OF ACTION

### (Abuse of Process)

140. Plaintiffs incorporate the previous allegations as though set forth entirely herein.

141. The Defendants' actions and statements regarding Remington as set forth above include the abuse of process, *vis-à-vis* the AZ Complaint.

142. Defendants knowingly and with malicious intent initiated the baseless AZ Complaint in an improper venue where Remington does not have "minimum contacts".

143. Defendants, with malicious intent, publicly misrepresented the objective of the AZ Complaint against Remington.

144. Defendants' Abuse of Process was executed in furtherance of the objective of the conspiracy as outlined in the First Cause of Action.

## ELEVENTH CAUSE OF ACTION

### (Unauthorized Access to Computer Systems)

145. Plaintiffs incorporate the previous allegations as though set forth entirely herein.

146. The Defendants' actions and statements regarding Gann's Facebook account as set forth above include the unauthorized access to computer systems, or "hacking". *Tennessee Statutes,* §§39-14-601 - 39-14-602.

147. Defendants' "hacking" of Gann's Facebook Account was accomplished in furtherance of the objective of the conspiracy as outlined in the First Cause of Action.

**Prayer For Relief**

WHEREFORE, having fully set forth their complaint, plaintiffs pray for relief from this Court as follows:

1. For relief under the First Cause of Action for civil conspiracy and damages arising thereof, together with additional damages through and after the time of trial; in the event that this matter is decided on default, plaintiffs allege that $1,200,000 is an appropriate amount of damages;

2. For relief under the Second Cause of Action for false light and damages arising thereof, together with additional damages through and after the time of trial; in the event that this matter is decided on default, plaintiffs allege that $1,200,000 is an appropriate amount of damages;

3. For relief under the Third Cause of Action for defamation and damages arising thereof, together with additional damages through and after the time of trial; in the event that this matter is decided on default, plaintiffs allege that $1,200,000 is an appropriate amount of damages; plaintiffs also request a court order or judgment explicitly stating that defendants' statements are false and defamatory;

4. For relief under the Fourth Cause of Action for tortious interference and damages arising thereof, together with additional damages through and after the time of trial; in the event that this matter is decided on default, plaintiffs allege that $1,200,000 is an appropriate amount of damages;

5. For relief under the Fifth Cause of Action for harassment and damages arising thereof, together with additional damages through and after the time of trial; in the event that this matter is decided on default, plaintiffs allege that $1,200,000 is an appropriate amount of damages;

6. For relief under the Sixth Cause of Action for intentional infliction of emotional distress and damages arising thereof, together with additional damages through and after the time of trial; in the event that this matter is decided on default, plaintiffs allege that $1,200,000 is an appropriate amount of damages;

7. For relief under the Seventh Cause of Action for misuse of private information and damages arising thereof, together with additional damages through and after the time of trial; in the event that this matter is decided on default, plaintiffs allege that $1,200,000 is an appropriate amount of damages;

8. For relief under the Eighth Cause of Action for impersonation and damages arising thereof, together with additional damages through and after the time of trial; in the event that this matter is decided on default, plaintiffs allege that $1,200,000 is an appropriate amount of damages;

9. For relief under the Ninth Cause of Action for copyright infringement and damages arising thereof, together with additional damages through and after the time of trial; in the event that this matter is decided on default, plaintiffs allege that $1,000,000 is an appropriate amount of damages;

10. For relief under the Tenth Cause of Action for abuse of process and damages arising thereof, together with additional damages through and after the time of trial; in the event that this matter is decided on default, plaintiffs allege that $1,200,000 is an appropriate amount of damages;

11. For relief under the Eleventh Cause of Action for unauthorized access of computer systems and damages arising thereof, together with additional damages through and

| | | |
|---|---|---|
| 1 | | after the time of trial; in the event that this matter is decided on default, plaintiffs allege that $1,200,000 is an appropriate amount of damages; |
| 3 | 12. | For punitive damages under common law for defendants' malicious and willful conduct in an amount to be proven at trial; in the event that this matter is decided on default, plaintiffs allege that $3,600,000 is an appropriate amount of punitive damages; |
| 6 | 13. | For plaintiffs' taxable costs as provided by statute; |
| 7 | 14. | For interest upon plaintiffs' taxable costs at the maximum legal rate from the date judgment is entered herein until the date such judgment is paid in full; |
| 9 | 15. | For plaintiff's attorneys' fees as provided by statute and by contract in an amount to be proven at trial; |
| 11 | 16. | For all other relief as this Court deems just and proper. |

RESPECTFULLY SUBMITTED this 6th day of August, 2014.

*/s/Susanne Gann*

Susanne Gann

Plaintiff

*/s/Darren Remington*

Darren Remington

Plaintiff